## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JANE DOE,

      Plaintiff,

    v.                             No. _____

THE BOARD OF REGENTS
OF THE UNIVERSITY OF
NEW MEXICO,

      Defendants.

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Jane Doe[1] brings this action under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* to remedy gender discrimination and sexual harassment she suffered as a student at the University of New Mexico. These harms directly resulted from Defendant Board of Regents of the University of New Mexico's breach of its duty to protect its students from unwanted sexual harassment and to provide an education and/or workplace free from sexual harassment and other forms of gender-based discrimination.

## INTRODUCTION

1.     Defendant has knowingly permitted Ricky Lee Allen, a prominent scholar of critical race studies and professor in the University of New Mexico's Department of Language, Literacy, & Sociocultural Studies to engage in multiple sexual relationships with students which amounted to sexual harassment and a hostile environment.

---

[1] "Jane Doe" has been substituted for Plaintiff's name for all causes of action brought through this Complaint which would otherwise publish important privacy interests of all parties. Plaintiff fears for her personal safety, as well as that of her family and friends as a result of this Complaint. Along with this Complaint, Jane Doe has filed a motion to proceed under a pseudonym.

2.      Allen ensured that young, women students were vulnerable to this sexual harassment by conditioning faculty mentorship and support on having a sexual relationship with him.  Among other things, Allen conducted happy hours in bars with students he was advising, invited students to his personal home for social interactions, invited students to watch movies outside of campus grounds, and would attend parties hosted by students.

3.      Defendant has known about the bad behavior of this professor.  Defendant's supervisory faculty, administrators, officers, and employees have received complaints regarding these sexual relationships perpetrated by Allen.  Among the complaints made against Allen were disclosures by Jane Doe to other University professors that she was engaged in a sexual relationship with Allen that was affecting her educational opportunities.  But Defendant did nothing and ignored these complaints.

4.      On August 21, 2018, Plaintiff against revealed to other University professors that she was engaged in a sexual relationship with Allen, that the relationship was affecting her educational opportunities, was unable to complete her dissertation, and that she was losing out on research and presentation opportunities that are highly valued for obtaining a tenure-track faculty position.

5.      It was only after this disclosure, more than four years after initial complaints were made, that Defendant took any action to correct Allen's inappropriate behavior.

6.      Moreover, Allen and Valdez later engaged in a series of unconstitutional retaliatory acts Allen filed and Valdez investigated a facially invalid and retaliatory complaint filed against Plaintiff alleging that Plaintiff violated University policy by truthfully telling others that she was sexually harassed by Allen.

7.     Plaintiff now turns to the Court for appropriate relief to remedy Defendant's past wrongs and to force the University of New Mexico to enact meaningful reforms that will permit women to engage in rigorous study without fear of being sexually harassed or being subject to gender-based discrimination.

## PARTIES

8.     Plaintiff Jane Doe is a female and resident of Bernalillo County, New Mexico.  At the time of events detailed in this Complaint, Jane Doe was a masters and doctoral student attending the University of New Mexico.

9.     Defendant Board of Regents of the University of New Mexico is an educational institution and governmental body in Bernalillo County, New Mexico.  It is the governing body of the University of New Mexico.  During all materials times to this action, Defendant received federal funding for its academic programs and activities.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this case according to 28 U.S.C. §§ 1331 and 1343, because Plaintiff's statutory claims under Title IX present a federal question over which this Court has jurisdiction.

11.     Venue is proper in this district according to 28 U.S.C. § 1391(b), since all parties reside or resided in this district and the events giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

### A.  Plaintiff's Background.

12.     Before pursuing a master's degree from the University of New Mexico, Plaintiff was employed as a high school and middle school teacher in the Albuquerque, New Mexico area.

13.     Plaintiff sought to be a teacher because of her work as a case worker with the Albuquerque Job Corps Center, a training and career development program for young adults seeking to be placed in meaningful jobs or to further education.

14.     After having her first child, Plaintiff made the decision to leave full time teaching and pursue a master's degree at the University of New Mexico.

15.     She enrolled in the University of New Mexico's Masters in Educational Thought and Sociocultural Studies program.

16.     While enrolled in that program, Plaintiff studied the systems of oppression for youth and the school-to-prison pipeline.

17.     This research inspired Plaintiff to pursue a Ph.D. in critical race studies so that she could work to dismantle these oppressive systems.

18.     In 2012, Plaintiff acquired her master's degree and enrolled in the University's doctoral program in Language, Literacy, and Sociocultural Studies with a concentration in Education Thought and Sociocultural Studies.

19.     After enrolling in the doctoral program, Plaintiff chose Allen as her doctoral advisor.

20.     Plaintiff chose Allen as her doctoral advisor after taking two courses with him during her master's studies.

**B.  Plaintiff Confides in Allen About Her Divorce and Personal Struggles.**

21.     Shortly after the beginning of Plaintiff's doctoral program, Plaintiff sought a divorce from her now ex-husband.

22.     The divorce proceedings were drawn-out and acrimonious, and included difficult litigation regarding the custody of Plaintiff's children.

23.     Plaintiff confided in Allen regarding her divorce proceedings.

**C.  Allen Uses His Position of Authority to Manipulate Plaintiff into a Romantic and Sexual Relationship.**

24.     Armed with personal information related to Plaintiff's divorce proceedings, and the inherent power that comes with being Plaintiff's doctoral supervisor, Allen began a series of inappropriate behaviors which led to a sexual relationship with Plaintiff.

25.     First, Allen started inviting Plaintiff to happy hours which occurred off campus and in bars.

26.     Allen drank alcohol with Plaintiff during those happy hours.

27.     After one of the happy hours in January of 2013, Allen asked Plaintiff to leave the happy hour and go home with him.

28.     Plaintiff accompanied Allen back to his house, after which they continued to drink alcohol.

29.     Later that night, Plaintiff and Allen had sex and Plaintiff stayed the night at Allen's house.

30.     Allen's interactions with Plaintiff before the sexual encounter are typical of those that engage in grooming and manipulation to have sexual intercourse when there is an inherent power differential between sexual partners.

31.     At the time of these social interactions and sexual encounter, Plaintiff was also taking Allen's class, which was a required course for her doctoral program.

32.     Allen acknowledged that this sexual encounter was a mistake and violated University policy, asking to "remain friends" but to not engage in a continuing sexual relationship.

33.     Following this sexual encounter, Allen continued to attend happy hours with Plaintiff and other students.

34.    Allen also stayed in constant contact with Plaintiff through text message.

35.    And Allen would have private, social interactions with Plaintiff where they would watch movies together.

36.    During this time, faculty and students at the University of New Mexico were aware of the close, personal relationship between Plaintiff and Allen, but nothing was done to stop the relationship or remove Allen as Plaintiff's doctoral advisor.

37.    In June 2013, Allen came over to Plaintiff's house to watch movies with Plaintiff. During this interaction, Allen stated "Well I don't see why we can't be more than friends."

38.    Allen's behavior leading up to this second sexual encounter was typical of grooming and manipulative behavior by those with power when there is an inherent power differential in sexual relationships.

39.    That night, Plaintiff had sex with Allen and began a sexual relationship which continued throughout the summer.

40.    For example, in August of 2013, Plaintiff attended a happy hour with Allen.  After that happy hour, Plaintiff went to Allen's house and had sex with him again.

41.    Plaintiff felt confused after this sexual encounter and wondered if Allen wanted to be in a relationship with her.

42.    Plaintiff believed that she was dating and in a relationship with Allen.

43.    During the Fall semester of 2013, Plaintiff was again taking one of Allen's classes.

44.    Plaintiff was having trouble in this class because Allen acted with hostility towards her, distanced himself, and stopped communicating with her.

45.    In December of 2013, which after the end of the semester, Plaintiff again had sex with Allen after a student happy hour.

46.     After this sexual encounter, Plaintiff asked Allen "how did I get into this mess?"

47.     Allen responded by stating that Plaintiff had to treat their sexual relationship with "secrecy."

48.     Allen then convinced Plaintiff that she had to remain quiet about the sexual relationship because she had the power to ruin his career.  During that conversation, Allen stated to Plaintiff that she did not "strike [him] as the vindictive type."

49.     Plaintiff did not report their sexual relationship at that time because Allen was the only professor in her department that taught the specialty which Plaintiff was pursuing.

50.     Also in late December of 2013, Plaintiff was pulled aside by another student who informed Plaintiff that Allen was previously in a sexual relationship with a different student.

51.     This common knowledge of Allen's sexual misconduct demonstrates Defendant's failure to act and to protect students from Allen's inappropriate and unlawful behavior.

52.     The sexual relationship between Plaintiff and Allen ended for a second time at the end of 2013.

53.     Following the end of the second sexual relationship between Plaintiff and Allen, the chair of Allen's department received a complaint from another faculty member that Plaintiff was engaging in a sexual relationship with Allen.

54.     That department chair did nothing to report or remedy the damage done by the sexual relationship.

55.     Around the same time, Allen became increasingly hostile towards Plaintiff, acting with a combination of indifference and anger, and occasionally ignoring Plaintiff altogether.

56.     For example, in 2014 and 2015, Plaintiff was preparing for her comprehensive exams.

57.     A doctoral student must pass their comprehensive exams in order to continue on to preparing a dissertation and receiving a Ph.D. from the University of New Mexico.

58.     The comprehensive exams at the University of New Mexico include an oral examination component.

59.     Because of their past sexual relationship and Allen's hostility, Plaintiff was uncomfortable and found it unable to contact Allen during this time.  The inability to contact Allen was a direct result of Allen acting angry and distant.

60.     The stress cause by the fractured relationship and the failure to communicate resulted in Plaintiff's comprehensive exams being delayed for a semester.

61.     And, Allen's inappropriate actions, anger, and hostility, resulted in Plaintiff breaking down and crying during the oral examination portion of her comprehensive exams.

62.     Upon information and belief, this hostility and inappropriate behavior was because Plaintiff was not engaging in a sexual relationship with Allen at the time and because of the report that Allen had engaged in a sexual relationship with Plaintiff.

63.     In March of 2015, Plaintiff was invited to speak on a panel of scholars at a conference in Chicago.  It is common that a student's doctoral advisor attends panel presentations by their advisees, especially when the advisor is also present at the conference.

64.     Allen was present at the conference and was Plaintiff's doctoral advisor at that time, yet did not attend Plaintiff's presentation.

65.     When Plaintiff confronted Allen for not attending her panel presentation, Allen stated that he did not do so because he was mad with Plaintiff for allegedly sharing information that was "supposed to be between" the two of them.

66.     Following that conversation, Plaintiff apologized to Allen for revealing the relationship to another student.

67.     In the Spring of 2015, Allen sent out an e-mail seeking interns.

68.     Plaintiff applied to be an intern with Allen.

69.     Plaintiff was not awarded an internship with Allen.

70.     Plaintiff did not receive the internship despite being qualified for it.

71.     Plaintiff later confronted Allen, asking why she did not receive an internship.

72.     Allen angrily replied that Plaintiff was bullying him and that he did not give her the internship because he was "redefining boundaries" with her.

73.     Upon information and belief, Plaintiff did not receive the internship because she was no longer having a sexual relationship with Allen and because she disclosed their sexual relationship.

74.     During the 2015-2016 school year, Allen again began a series of grooming and manipulative behaviors commonly employed by the more powerful person is an inherent power differential among possible sexual partners.

75.     For example, in the Fall of 2015, Allen asked Plaintiff out for beers during which they discussed the fact that Allen's mother was sick.

76.     In the next semester, Allen was attending the same conference as Plaintiff.  When they returned, Allen's mother died and he called Plaintiff for assistance.

77.     Plaintiff picked up Allen from the hospital, and then entered into a close personal relationship with Allen.

78.     For example, Plaintiff helped Allen clean out his mother's apartment.

79.     Plaintiff took Allen to get his wisdom teeth removed.

80.     And Plaintiff traveled with Allen to Denver to see a concert together.

81.     While there was no sexual relationship at the time, Allen, upon information and belief, was laying the groundwork to re-establish a sexual relationship with Plaintiff.

82.     Following these encounters, Plaintiff asked Allen to assist with her dissertation.

83.     After this request, Allen and Plaintiff had sex.

84.     Before having sex with Plaintiff, Allen informed Plaintiff that they could continue their sexual relationship because Defendant had a new policy allowing professors to have sex with students as long as the relationship was disclosed.

85.     Allen was refencing Administrative Policies and Procedures Manual Policy 2215: Consensual Relationships and Conflicts of Interest.

86.     That policy states that Defendant "has no interest in romantic or sexual consensual relationships involving members of the campus community.  However, when such relationships occur in education . . . contexts, they can present serious ethical concerns and compromise the University's academic and work environment, in part due to an inherent power differential between the parties."

87.     That policy prevented a superior, defined to include a faculty member, who was engaged in a sexual relationship with a subordinate, defined by the policy as student, from exercising any authority, defined by the policy as "teaching, supervising, evaluating, or advising," over a subordinate.

88.     Under this definition, Allen was a superior and Plaintiff was a subordinate.

89.     Therefore, the policy required Allen to fill out paperwork disclosing the sexual relationship and required Allen's supervisor to manage the conflict of interest by "providing an alternative means for the teaching, supervising, evaluating, or advising the subordinate."

90.     Upon information and belief, Allen never filed the appropriate form.

91.     Nevertheless, upon information and belief, Allen's supervisor was aware of the sexual relationship and did not provide for alternative means of supervision.

92.     Despite the failure to follow these policies, Allen continued his sexual relationship with Plaintiff.

93.     Around this time, Plaintiff would drive to Allen's house, leave her car there, and then travel to parties with Allen.

94.     These parties included parties hosted by students of Allen.

95.     Allen and Plaintiff would also attend dinner parties or go on dates with other couples.

96.     Also during this time, Allen and Plaintiff would continue to get together privately to drink beer and watch movies.

97.     Also during this time, Allen would offer Plaintiff educational and career opportunities but take them away when the relationship would sour.

98.     For example, Allen offered Plaintiff the opportunity to teach one of his classes during the summer semester of 2018 but took away the offer when their relationship soured and when Plaintiff was not having sex with him.

99.     When Plaintiff would question Allen about the nature of their relationship, Allen would say that he never gave her the impression that the relationship was anything more than sex and that he didn't want a relationship with anyone at that moment.

100.    Despite those statements by Allen, he continued to have sex with Plaintiff, having four sexual encounters between January and March of 2018.

101.    During the time of those four sexual encounters, Allen was editing Plaintiff's dissertation, was her advisor, and was the chair of her dissertation committee.

102.    In March of 2018, Plaintiff became aware that Allen was having a sexual relationship with another student.

103.    At this time, Allen started to isolate Plaintiff, making sure that she was the odd man out.

104.    Allen's behavior became emotionally abusive.

105.    When Plaintiff confronted Allen about his sexual relationship with another student, Allen stated that Plaintiff just "needed attention" and asked whether she was "surveilling him."

106.    Plaintiff ended her sexual relationship with Allen after that conversation.

107.    After Plaintiff ended her sexual relationship with Allen, Allen carried out a campaign of smears designed to take away Plaintiff's educational opportunities.

108.    For example, after Plaintiff filed a complaint with the University regarding Allen's inappropriate behavior, Allen told colleagues around the country that he had engaged in a sexual relationship with Plaintiff, restricting her ability to participate in conferences and present her research.

109.    Allen also refused to provide adequate feedback and comments to drafts of Plaintiff's dissertation.  This was in stark contrast to the active work and editing Allen put into advising Plaintiff regarding her dissertation when she was engaged in a sexual relationship with Allen.

110.    And this behavior was similar to previous times when Plaintiff was not engaged in a sexual relationship with Allen where Allen stopped responding to Plaintiff's e-mails seeking review of articles which she wanted to publish or submit to presentations.

**D. Defendant Had Actual Notice of Harassment Perpetrated by Allen, Failed to Comply with Its Own Internal Policies and Was Deliberately Indifferent to His Conduct.**

111.    University faculty, including the chair of Allen's department, are "responsible employees" and required to report to the University Office of Equal Opportunity any report of sexual harassment, sexual misconduct, or sexual violence by a faculty member.

112.    The Chair of Allen's department received a report that Allen was engaged in a sexual relationship with Plaintiff.

113.    The knowledge of the Chair of Allen's department is imputed to the University because of his role as a mandatory reporter.

114.    The sexual relationship between Plaintiff and Allen constituted sexual harassment, sexual misconduct, or sexual violence.

115.    Yet the complaint was never referred to the University's Office of Equal Opportunity.

116.    Nor was any action taken by the University to intervene and protect Plaintiff from Allen's sexual misconduct.

117.    The sexual relationship between Allen and Plaintiff was an open secret within the department.

118.    University faculty members knew but did nothing to protect Plaintiff.

119.    For example, another University professor admitted that they knew about the sexual relationship in 2018, but failed to report the relationship to the University or to intervene in order to protect Plaintiff.

120.    In August of 2018, Plaintiff once again reported to a University faculty member that she was being deprived of educational opportunities as a result of no longer being engaged in a sexual relationship with Allen.

121.    That faculty member reported the relationship to the University's Office of Equal Opportunity, which opened an investigation.

122.    Allen was placed on administrative leave pending the investigation.

123.    An investigation was conducted, which determined that Allen engaged in quid pro quo sexual harassment and that he deprived Plaintiff of educational opportunities in violation of University policy.

124.    Allen later filed an internal appeal, but the appeal was denied.

125.    Allen was then suspended by the University.

126.    The suspension, which occurred in 2019, was years late and an only occurred after years of deliberate indifference.

**E.  Defendant Retaliates against Plaintiff for Telling a Truthful Account of the Harassment She Experienced.**

127.    Nevertheless, despite suspending Allen, Allen and the University continued to retaliate and punish Plaintiff.

128.    For example, Allen later filed a complaint against Plaintiff alleging that Plaintiff retaliated against him.

129.    That complaint alleged that Plaintiff retaliated against Allen by lying and saying that she was a victim of quid pro quo sexual harassment perpetrated by Allen.

130.    The complaint was assigned for review and investigation to Melissa Valdez Lopez, an investigator at the Office of Equal Opportunity.

131.    This complaint was facially invalid, and Valdez Lopez knew it was invalid, because she had previously determined following a separate internal investigation that Allen had violated university policy and engaged in quid pro quo sexual harassment during his relationship with Plaintiff.

132.    Nevertheless, Valdez Lopez accepted jurisdiction of the complaint and began an investigation into Allen's claims.

133.    That complaint also alleged that Plaintiff retaliated against Allen when she was attempting to obtain a substitute professor in her specialty for her dissertation committee.

134.    During that process, Plaintiff asked professors from other institutions to serve on her committee.

135.    When making those requests, Plaintiff exercised her right to tell her own story, specifically to tell those professors that she needed a substitute expert on her dissertation committee because Allen had sexually harassed her and been suspended from the University.

136.    Specifically, Plaintiff stated that there was a sexual harassment complaint against Allen, that the complaint was found to be valid, and that Allen could no longer serve on her dissertation committee because he was suspended from the University for sexually harassing Plaintiff.

137.    Defendant's policies and procedures specifically allow for victims of sexual harassment to tell their story and telling that story to others cannot be considered retaliation under any set of circumstances.

138.    Nevertheless, Valdez Lopez accepted jurisdiction of that complaint and launched a comprehensive investigation to determine whether Plaintiff retaliated against Allen.

139.   Upon information and belief, Valdez Lopez accepted jurisdiction because Plaintiff spoke out regarding the sexual harassment, she suffered at Defendant University and because Plaintiff truthfully told her story.

140.   The launching of this investigation regarding Allen's facially unmeritorious complaint occurred because of Plaintiff's gender and in an attempt to minimize the seriousness of Defendant's and Allen's misconduct.

141.   For example, part of the investigation included Defendant contacting prominent faculty members and researchers in Plaintiff's field of study at other universities to state that Plaintiff was being investigated for retaliating against Allen when she disclosed that she was sexually harassed.

142.   By telling those faculty members and researchers that Plaintiff was being investigated for retaliation, Defendant tacitly stated to Plaintiff's field of study that Plaintiff was lying when she told those professors and researchers that Allen had sexually harassed her.

143.   Plaintiff, however, always told the truth regarding Allen's harassment.

**F.  Plaintiff Suffers Physical, Emotional, Reputational and Financial Harms.**

144.   Defendant's actions altered and worsened the environment of Plaintiff's education at the University of New Mexico.   Defendant's conduct was so severe, pervasive, and/or objectively offensive that it deprived Plaintiff of access to educational opportunities or benefits provided by Defendants.

145.   In particular, Allen's actions and the University's deliberate indifference towards those actions caused trauma and stress that made it physically impossible for Plaintiff to be present on campus, maintain a graduate teaching assistantship, attend conferences, and complete her dissertation.

146.    As a result of the actions of Allen and Defendant, Plaintiff suffers from and has suffered from physical and psychological injuries, including:

     a.  Insomnia and generalized anxiety;

     b.  Post-traumatic stress disorder;

     c.  Sense of betrayal;

     d.  Becoming physically ill;

     e.  Loss of appetite;

     f.  Strong and debilitating sense of guilt and shame; and

     g.  Feelings of despair and hopelessness

147.    As a result of Defendant's unlawful conduct, Plaintiff has also suffered substantial harm to her academic career, resulting in damage to her future educational and career prospects. Plaintiff has also suffered significant financial losses and will incur further financial losses in the future.

## COUNT ONE

**VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972,
AS AMENDED –
SEXUAL HARASSMENT – HOSTILE EDUCATIONAL ENVIRONMENT
20 U.S.C. § 1681, *et seq.***

148.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

149.    Upon information and belief, at all times relevant to this action, Defendant has received, and continues to receive, federal financial assistance.

150.    Defendant has subject Plaintiff to a sexually hostile educational environment in violation of Title IX.

151.     Defendant has discriminated against Plaintiff by subjecting her to a sexually hostile environment that was sufficiently severe, pervasive, and objectively offensive to interfere with the Plaintiff's educational opportunities, undermining and detracting from her school experience. Because of Defendant's failure to follow procedures to detect, monitor, and correct this discrimination and hostile environment, Defendant has denied Plaintiff her personal right to work and learn in an environment free of sexual harassment.

152.     Defendant was on actual notice of the sexual harassment, which was continuing and ongoing until 2018, committed by John Doe and the hostile academic environment that Plaintiff endured at the University of New Mexico during the relevant timeframe.  Defendant has demonstrated deliberate indifference by tolerating, condoning, ratifying, and/or engaging in the hostile work and educational environment and failing to take remedial action.

153.     Because of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

154.     By reason of the continuous nature of Defendant's unlawful conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged in this Complaint.

155.     Plaintiff is entitled to all legal and equitable remedies for violations of Title IX, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

## <u>COUNT TWO</u>

**VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972,**
**AS AMENDED –**
**GENDER DISCRIMINATION IN TERMS AND CONDITIONS OF EDUCATION**
**20 U.S.C. § 1681, *et seq.***

156.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

157.     Upon information and belief, at all times relevant to this action, Defendant has received, and continues to receive, federal financial assistance.

158.     Defendant has discriminated against Plaintiff by subjecting her to different treatment on the basis of her gender.  Plaintiff was treated differently and less favorably, treatment which was continuing and ongoing until 2018, than similarly-situated male students.  Defendant subject Plaintiff to disparate terms and conditions of education in violation of Title IX.

159.     Defendant's different treatment of Plaintiff is a direct and proximate result of gender discrimination.

160.     Defendant has failed to prevent, respond to, adequality investigate, and/or appropriately resolve instances of gender discrimination.

161.     Defendant had actual notice of this discrimination and failed to adequately respond, both before and after discrimination against Plaintiff occurred, amounting to deliberate indifference.

162.     Because of the continuous nature of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

## COUNT THREE

**VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972,
AS AMENDED –
*QUID PRO QUO* SEXUAL HARASSMENT
20 U.S.C. § 1681 *et seq.***

163.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

164.    Upon information and belief, at all times relevant to this Complaint, Defendant has received, and continues to receive, federal financial assistance.

165.    Defendant has discriminated against Plaintiff by creating and maintaining a hostile educational environment in violation of Title IX.  The hostile environment endured by Plaintiff, which was continuing and ongoing until she finished her degree program in 2020, was sufficiently severe, pervasive, and objectively offensive to interfere with Plaintiff's educational opportunities, undermining and detracting from her school experience.

166.    Plaintiff was subject to unwelcome *quid pro quo* sexual harassment based on her sex.  Plaintiff was engaged in a sexual relationship, which included sexual comments, sexual advances, touching, and sexual intercourse.  Plaintiff was expected to submit to this sexual conduct in exchange for favorable academic treatment, including mentoring time, research assistance, grades, and other academic opportunities.

167.    Defendant had actual notice of this conduct by John Doe and was deliberately indifferent to his harassment, both before and after the harassment of Plaintiff occurred.  Such deliberate indifference places Plaintiff and other students at risk of sexual harassment.

168.    By reason of the continuous nature of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer harm, including but not limited to loss of future educational

and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

169.    By reason of the continuous nature of Defendant's unlawful conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged in this Complaint.

## PRAYER FOR RELIEF

Plaintiff therefore requests that this Court grant the following relief:

A.    A permanent injunction against Defendant and its officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, and usages as set forth in this Complaint;

B.    An Order requiring Defendant to initiate and implement programs and policies that (i) remedy the gender discrimination, sexual harassment, and hostile environment at the University of New Mexico; (ii) ensure prompt remedial action regarding all claims of gender discrimination, sexual harassment and hostile environment; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described herein;

C.    An award of damages to Plaintiff under Title IX of the Education Amendments of 1972 including compensatory damages and punitive damages, in an amount to be proven at trial;

D.    An award of litigation costs and expenses, including reasonable attorneys' fees to Plaintiff;

E.    An award of pre-judgment interest and post-judgment interest available under law; and

F.    Such additional and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable by right by jury.

DATED:        November 18, 2020                    Respectfully submitted,

*/s/ Nicholas T. Hart*

Nicholas T. Hart
Ramon A. Soto
**HARRISON & HART, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102
T: (505) 295-3261
F: (505) 341-9340
nick@harrisonhartlaw.com

H. Jesse Jacobus, III
**FREEDMAN BOYD HOLLANDER
GOLDBERG URIAS & WARD, P.A.**
20 First Plaza, Suite 700
Albuquerque, NM 87101
T: (505) 842-9960
F: (505) 842-0761
hjj@fbdlaw.com

*Attorneys for Plaintiff*